## CARN v. STATE.

No. A-11033.   Oct. 5, 1949.

(210 P. 2d 380.)

C. D. Wilkinson, Idabel (deceased), and Sam Carn, pro se., for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, J.   Defendant Sam Carn was charged in the district court of McCurtain county with the crime of rape in the first degree.   Upon his trial the jury found him guilty as charged, and fixed his punishment at confinement in the State Penitentiary for 99 years.   Motion for new trial was duly filed and overruled, and on November 21, 1947, the court entered judgment and sentence

in conformity with the verdict. To reverse the judgment and sentence, defendant has appealed.

The petition in error with case-made attached was filed in this court on March 18, 1948. Under the rules of the court, defendant had 60 days within which to file a brief. No brief has been filed, and no extension of time therefor requested. The case was assigned for oral argument for May 18, 1949, and no appearance was made on behalf of the defendant.

Ordinarily, where the defendant appeals from a judgment of conviction and no brief is filed and no appearance for oral argument made, we do not consider it the duty of this court to go into a careful examination of the evidence to determine whether or not the trial court erred in admission or rejection of testimony. This court will examine the record for jurisdictional errors, and where none appear, the judgment will be affirmed.

However, courts are especially charged with the duty to carefully examine the evidence in rape cases, where, as observed by Lord Hale, the accusation is easily made, difficult to be proved, and still more difficult to be defended by one ever so innocent. In the instant case the defendant was given what amounts to a life sentence, and we have carefully read and considered the entire record, including all of the evidence.

The defendant was charged with having raped one Emma Wilson, who was under the age of fourteen years. The parties involved are all Indians, and an interpreter was called in while the prosecutrix was on the stand, and also used for one of the defense witnesses.

The state used four witnesses. Dr. R. D. Williams, who testified that he examined the prosecutrix on the morning of September 25, 1947; that she was badly

bruised; that in his opinion there was no doubt but that she had recently had intercourse, and that she had been penetrated.

Simon Wilson, the father of prosecutrix, testified that his daughter was 12 years of age. She attended Oak Hill school, one and one-half miles from home. She walked to school, down a good wagon road, and usually walked the distance in about an hour. She left home on the morning in question about 7 o'clock. He was not around her and she had no opportunity to tell him what had happened until that night, when the deputy sheriff took the prosecutrix to witness at the church. Witness took her to Dr. Williams the next morning.

The prosecutrix testified that she was in the fourth grade at school, and had known the defendant all of her life. On the morning in question when she was about half way to school, she heard someone whistle, and the next thing she knew the defendant grabbed her wrist. That "he put both arms around my stomach" and held her, carried her over the fence into the woods, and committed the act charged. That after the defendant had accomplished his purpose, he was attempting to remove his trousers and she got up, picked up her panties and ran. She went on to school. Her testimony was that she struggled and cried, and defendant told her if she cried loud he was going to kill her. At school she told her half-sister what had happened to her. On cross-examination she was asked why she did not tell her teacher, a Mr. Baker. Her answer was: "A. No, sir. I was choked up and I couldn't talk, or tell him to make him hear me." And that she did not tell because defendant had said he was going to kill her if she told anyone. A few days after the incident she went back down this road with her father, the county attorney and deputy sher-

iff, and showed them where the defendant had accosted her, where he took her over the fence, and where the act was committed. Her evidence was clear and convincing, She did not contradict herself in any way.

It is not clear who notified the deputy sheriff of the crime, but the report must have been through the half-sister. The deputy sheriff testified that he first heard of it about 6:30 that afternoon, when the prosecutrix came to his house, and he went with her to her father, who was at the church. He testified that she went with him, the county attorney and her father and pointed out the place in the woods where the crime was committed, and that "the grass was stomped around and the ground torn up a little" at the spot indicated by the prosecutrix.

Defendant testified that he was 40 years of age. He and Watson Taylor spent the night of September 23rd at the home of Myrtle Taylor, about half way between the home of prosecutrix and the schoolhouse, but not on the road traveled by prosecutrix. He left the Taylor home at 7 o'clock Wednesday morning, the 24th, going towards Oak Hill. He met George Tisho, and with Watson Taylor they went to the store of Fred Harraman and called a taxi from Broken Bow to come and get them. At Broken Bow they purchased a case of beer, and had the taxi take the three of them and the beer into the country. They directed the driver to return for them about 10 o'clock, and he took them back to town about 10:30 that morning. They got another case of beer, and returned to the same place. In the afternoon they went to Broken Bow again and got two more cases of beer, and had the taxi driver take them toward Oak Hill, and let them out near a little Indian church. They stayed there all afternoon, drinking beer, and went up to the church a little after dark, and defendant there learned

of the charges made against him. On direct examination he was asked:

"Q. And you tell the jury you were no closer to the Wilson house than the Taylor place that day? A. No, sir. Q. And you did not see Emma Wilson,? A. No, sir. Q. Or have sexual intercourse with her? A. No, sir."

This was all of the testimony of the defendant directly concerning the charge.

On cross-examination defendant testified that he had been in Durant and returned to Idabel on Tuesday night. He got a taxi to take him to Oak Hill, and testified that he was "pretty full but I knew what I was doing." He and Watson Taylor had some whisky later, and he got pretty drunk. He returned to Broken Bow for more whisky and went to Little River for the same purpose. He returned to Myrtle Taylor's home about one o'clock Wednesday morning, and Myrtle and her children were there. He admitted that he raised a little disturbance around Myrtle's place, and left, returning about 3 o'clock, and she and her children were gone. He admitted causing other disturbances in the neighborhood during the night, which was the night prior to the crime charged.

The taxi driver testified for defendant that he received the call from Harraman's store soon after 8 o'clock Wednesday morning and corroborated the defendant with reference to hauling the defendant and his two companions and the beer to the country.

George Tisho, an Indian who did not speak English, corroborated the defendant's testimony, but did not know the time of day that they met that morning.

Fred Harraman, postmaster and storekeeper at Oak Hill, testified that the defendant with George Tisho and Watson Taylor came to his store and called a taxi about

7:30 Wednesday morning, but on cross-examination testified: "I don't remember what time it was." The defendant had been to his house about 2 o'clock that morning, and awoke him.

On rebuttal the state recalled the father of prosecutrix, and also called Watson Taylor, the other Indian boy who spent the day with the defendant. Taylor testified that he was with the defendant on Tuesday night, September 23rd, and that they got pretty drunk together. They spent the night at Myrtle Taylor's house, and he got up about 7 in the morning and went to the home of Simon Wilson, and was there when Emma left for school. Simon Wilson testified that Taylor got to his house between 6 and 6:30 and left about 8 that morning.

In his petition in error the defendant sets out six assignments, namely: (1) that the court erred in overruling the demurrer to the evidence; (2) in overruling defendant's request for a directed verdict; (3) that the punishment inflicted is excessive, under the facts proven, and amounts to cruel and unusual punishment; (4) that the verdict was the result of passion and prejudice; (5) that the verdict is contrary to law and the evidence; and (6) that the court erred in overruling the motion for new trial. As hereinbefore stated, these questions have not been briefed.

From a careful consideration of the record, we are of the opinion that no fundamental error was committed by the trial court. The information was in proper form, and is sufficient to charge the defendant with the crime of rape in the first degree. The testimony of the state and the defendant raised disputed issues of fact, which were in the exclusive province of the jury to determine. The instructions of the court were in proper form, and

fully instructed the jury on the issues involved. No exceptions were taken to any of the instructions, and none offered by the defendant. The testimony of the state was sufficient, if believed by the jury, to sustain the conviction.

The punishment in this case is severe. The crime, if committed, was a heinous one. But in this case, we are inclined to apply a modern philosophy of penology, that the punishment should fit the offender, and not merely the crime. Since this case was submitted on May 18, 1949, it has been called to the attention of the court that Mr. C. D. Wilkinson, the attorney who represented the defendant in the trial of his case, and who lodged this appeal, died subsequent to filing the appeal. The defendant is a full-blood Indian, and the records in the office of the Pardon and Parole Board show that he attended school only two years, that he had no prior criminal record, and that he has no relatives whatever. He was delivered to the penitentiary on November 22, 1947, the day following his sentence, and has been confined since that date. Being uneducated, confined in the penitentiary, his attorney having died and he having no relatives and no other interested party to appear in his behalf, this court has concluded that justice would be served by modifying the judgment and sentence from one of 99 years in the penitentiary, to 30 years in the penitentiary. As so modified, the judgment and sentence of the district court of McCurtain county is affirmed.

JONES, P. J., and BRETT, J., concur.